By the Court—Bosworth, Ch. J.
The primary and main object, if not the sole object, of confiding to J. Day & Co. the powers vested in them was, that third persons might obtain insurance upon cargoes by application to them, with like force and effect as upon an application to the defendants themselves; and that J. Day & Co. might execute and deliver to all persons, applying to and contracting with them as agents of the defendants, *550 authentic evidence that such persons were insured by the defendants as effectually and absolutely as by a formal Policy issued by the defendants themselves, and were insured against the risks described in the certificates issued and delivered by J. Day & Co. to the persons thus insured.
The defendants’ letter to J. Day & Co. of the 27th of October, 1852, states the object of the defendants in delivering the Marine and Eire Policies which it accompanied, and the use to be made of the certificates furnished therewith, and declares that “the certificates are to be used as evidence for the assured that the risks described by them are covered by the Policy in your” (J. Day & Co.’s) “hands, and are^onsidered by us in fact as representing a Policy issued by the Company itself, subject to all the conditions of the same, and, in case of loss, payable in like manner.”
This letter of instructions also states that “we” (the defendants) “ have not named a limit in the Marine Policy, knowing the great difficulty you would have in fixing an amount with the parties for whom you would be called upon to insure; but it is our wish that you should not incur a liability for more than $10,000 by any one first-class boat, nor more than $5,000 by any other craft.” On the 15th of November, 1852, J. Day & Co., on being applied to, as such agents, by the plaintiff, for insurance, issued to the plaintiff a certificate signed by them, (the certificate being one which the defendants had furnished to J. Day & Co., to be signed and delivered by them as such agents,) which certificate declares that the plaintiff “ is insured by the said Union Mutual Insurance Company” * * “ on cotton shipped per good steamboats, from points on the Chattahoochee river to Apalachicola, and consigned to ” the plaintiff, “ valued at....., per indorsements made in book by J. Day & Co., on board the.....,......master, at and from ____to.....; time of sailing....., bills of lading dated......” On the back of this certificate, J. Day & Co., on the 15th of November, 1853, made and signed an indorsement in these words, viz.: 1
“ The foregoing Policy is hereby renewed, to cover all cottons, as per the body of the Policy, from the 15th of November, 1853, to 1st July, 1854.
“ Apalachicola, 15th Nov., 1853. J. Day & Co.
“See parties’ names in book annexed.”
*551 This certificate, when received, was pasted in, or attached to, a book kept by the plaintiff, in which he entered the cargoes intended to be protected and covered by the certificate from time to time, when informed of the fact of cotton having been actually shipped, consigned to him, and he exhibited to J. Day & Co., monthly, such certificate and book and the entries therein made. The entries were made in pencil by the plaintiff in the first instance, and were written over by J. Day & Co., on being found to be correct. They, at the same time, entered in the book in which they had pasted Policy No. 784 . the goods thus ascertained'to have been at risk and the amount of premium payable for insurance thereon under the said certificate. At the time of issuing and delivering the said certificate to the plaintiff, they made an entry in their book in which they had pasted Policy No. 784, stating the grant of the said certificate, the purpose for which it had been issued, and also entered, at the time, the fact of its renewal from the 15th of November, 1853, to the 1st of July, 1854.
Was the said certificate a valid contract between the plaintiff and the defendants, at the moment it was issued and delivered by J. Day & Co. to the plaintiff? Could the latter, as a matter of right, recover upon and by reason of it for a loss of property described as insured by it, in a case in which no question could arise as to J. Day & Co. having insured to a larger amount in all than Policy No. 784 authorized?
By the terms of the Policy (No. 784,) it was “to cover only property which may be indorsed hereon by said J. Day & Co.” It covers “ all kinds of lawful goods,” &c., “laden or to be laden” on board any good vessel or steamer, &c.
“ The premiums on risks to be fixed at the time of indorsement ; and such clauses to apply as the Company may insert, as the risks are successively reported.”
“ This Policy to be deemed continuous, unless otherwise directed by either party; thirty days’ notice being given to the assured to enable risks which had already attached previous to the receipt of notice by J. Day & Co. to terminate."
If a Policy, in form like this one, had been issued directly by the defendants to the plaintiff, and such Policy had stated that it yms “ to cover only property which may be indorsed hereon by the President of the Union Mutual Insurance Company,” and the *552 President of the Company, subsequent to its execution and delivery, had indorsed thereon, viz., “ This is to cover all cotton shipped per good steamboats from points on the Chattahoochee river to Apalachicola, and consigned to S. H. Hartshorne,” I think it would not be doubted that the Company would be liable for a loss of cotton coming within the description contained in such indorsement.
There was indorsed upon Policy No. 784, at the time the certificate of insurance was delivered to the plaintiff by J. Day & Co., the following entry, to which some modifications in the valuations appear to have been added at subsequent dates, viz.:
“Nov. 15, 1852. Certificate granted to S. H. Hartshorne, to cover all cotton shipped per good steamboats from points on the Chattahoochee river to Apalachicola, by or for account of the following parties, and consigned to S. H. Hartshorne: valuation per bale annexed to each name.
“ Eire risk at Apalachicola three days after landing:
1W. T. Simpson from Eufaula, valued at $50 per bale.
“ Roberts & Locke, “ J. M. Morrison, “L. J. Leaird,
“L. F. Stow,
“D. Morris,
^ tS S *c3 a? 5 « »
§ | § S
“ “ 50 “
“ “ “ 50 “
“ “ “ 45 “
“ “ “ 50 “
“ Georgetown, “ 50 “
“ Harrison & Godwin, from Eufaula, valued at invoice.
“ J. M. Hamilton & Co., “ “ “ $50 per bale.
“ G. A. Roberts, “ “ “ 45 “
“J. P. Adams, valuation at $50 per bale—increased from December 14, 1853.
“Above reduced to $45 per bale, from date of Feb. 4, 1854.”
At the time of the renewal of the certificate held' by Hartshorne on the 15th of November, 1853, there was indorsed on Policy (No. 784) by J. Day & Co., underneath the indorsement made thereon (on the 15th of November 1852,) the following, viz.:
“Nov. 15, 1853.
“The above certificate renewed from this date to 1st July, 1854.
“J. Day &' Co.”
*553 Thus, there was indorsed on the Policy, that “cotton” was insured by it under the certificate issued to the plaintiff; the names of the persons who were to ship it; the place where they resided; the name of the consignee; the voyage to be made; the class of steamers on which the property was to be shipped, and the per bale valuation of the cotton so insured.
“Property,” viz.: cotton thus described and identified, was “indorsed hereon (on the Policy) by said J. Day & Co.,” on the 15th of November, 1852, as insured by it; and the Policy in terms declares that the Policy is to “cover property which may be indorsed hereon by said J. Day & Co.”
The certificate issued to the plaintiff, when read in connection with the indorsement thus made on the Policy, is very intelligible.
It reads thus: “Entered this date, on Policy (No. 784) issued by the Union Mutual Insurance Company of the city of New York, sundry amounts per indorsements made in book accompanying this certificate by J. Day & Co., on account of sundry parties whose names appear on book, payable in case of loss,” &c., “on cotton shipped,” &c. The “sundry parties” are the persons whose names were specified in the indorsement made on Policy No. 784, and which names were also written in the “book accompanying this certificate."
The Policy No. 784, the certificates and letter of instructions furnished with it by the defendants to J. Day & Co., when considered separately or together, indicate no intent of the defendants, that J. Day & Co. should not make contracts of insurance in this manner; nor do they furnish any warrant for saying that the indorsement which J. Day & Co. made on the 15th of November, 1852, on the Policy (No. 784) was not as definite and as full in its particulars as it was contemplated by the defendants they might have occasion to make, in transacting their business within the limits of the powers intended to be conferred.
The Policy (No. 784) insured goods “laden or to be laden,’ and the contract evidenced by the certificate by its reference to and embodiment of the provisions of Policy No. 784, as part of such contract, makes it a valid contract between the plaintiff and the defendants.
The letter of the 27th of October, 1852, states as a reason why no limit has been prescribed as to the amount of insurance which *554 could be rightfully.granted (upon cargo in any one boat, to any person or persons under the Mariné Policy,) that the defendants knew “the great difficulty you” (J. Day & Oo.) “would have in fixing an amount with the parties for whom you would be called upon to insure.”
It appears, without contradiction, that for many years prior to the defendants conferring authority on J. Day & Oo. to make contracts of insurance for them, and during all the time that such authority existed and was exercised, the course of business was, that the consignees of cotton residing at Apalachicola “insured the cotton shipped to them by parties residing in the interior and sending it by the rivers to that place; that from the want of rapid communication with the interior, (the mails being carried by steamboats,) it was impossible to know when the cotton was shipped, (at the time of shipping it,) as the cotton would frequently arrive before or with the advices of its shipment, and that therefore the practice was and had been during all that period,” (some fifteen years,) “ in reference to open Policies, to regard all cotton shipped under the open Policies as covered by them, although the details of the specific shipments were not entered on the Policies.”
The defendants in their letter to J. Day & Oo. of the 15th of January, 1853, say: “We notice quite a large amount under Policy Ho. 14, but presume it will go down the river by a number of boats, and that you have limited the amount by any one boat at one time, not to exceed $10,000." .
J.- Day & Co., in their reply of the 27th of January, 1853, state that “it is very seldom that the amount of risk on any one steamer reaches over $5,000 or $6,000, by all the parties to whom we have given open Policies."
The defendants, in their letter to J. Day & Co. of the 14th of February, 1853, say: “If you can conveniently, we should be glad to have you specify in your returns the name and amount by each boat, and oblige,” &c.
J. Day & Co. replied on the 26th of February, 1853, that: “It would be difficult to give the amount of risk on any one particular trip of any boat. We could give the amount by any one boat for each month very easily.”
*555 In answer to this, the defendants wrote to J. Day & Co. on the 7th of March, 1853, thus: We “ can only say that we wish you to use caution in accepting the river risks, keeping the amount by any one boat as small as you can consistently, and scattering the fire risks as much as possible. If at any time you find the returns larger than prudence would dictate on the premiums, &c., we can get reinsurance done here on advice from you.”
I think the defendants are chargeable with notice of the manner in which J. Day & Co. transacted business for them, and that there is nothing in it opposed to the apparent intent and expectations of the defendants in respect thereto at the time of employing them, as evidenced by the papers which .they furnished to J. Day & Co. as constituting their authority and indicating the course they were to pursue.
If this be a correct view, then it lollows that the certificate issued to the plaintiff by J. Day & Go. on the 15th of November, 1852, was from the time of issuing it a valid contract of insurance, and continued to be a valid and continuing contract, so long as by its terms, or by agreement between the parties, it continued in force.
All cotton of the description which it declares to be covered by it, is insured by it, and upon a loss occurring, the defendants are liable for it as the insurers.
If a valid contract, it could not be terminated by the mere fact that J. Day & Co., as the agents of the defendants, subsequently-made contracts of insurance with other parties and issued certificates to them.
If under all the certificates issued, property was put at risk of a larger aggregate amount or value than they could make valid contracts to insure, and if for that reason some of such certificates must be rejected, as made without authority, or treated as having become inoperative, I do not see on what principle a second contract is to override and defeat a prior contract between the Company and other parties valid when made, and existing in full force when the second one was entered into.
The Judge at Special Term treated the contract between the plaintiff and the defendants as having been, in effect, made when the cotton in question was shipped. He says: “ I consider the contract of insurance as to the cargo of the Alabama cannot be *556 treated as in existence until this 1st day of February, 1854, at the earliest.”
The cotton which was shipped by this boat was not at risk, it is true, until it was put on board. But a valid contract was made certainly as early as the 15th of November, 1858, that all cotton which the shippers of the cotton in question should ship between that date and the 1st of July, 1854, from the places named, consigned to the plaintiff, should be protected against the perils enumerated in Policy Ho. 784, and that the defendants would pay to the plaintiff the amount of any loss which should be suffered.
That fact was constructively known to every person to whom J. Day & Go. subsequently granted certificates, or with whom they made contracts of insurance, who is chargeable with notice of the indorsements made on the pattern Policy, by J. Day & Co., of the grant of certificates under it.
It seems to me, therefore, that, if any party is to be defeated of his insurance on the ground of there being an aggregate limit of risks beyond which J. Day & Oo. could not bind the defendants, the one who obtained a certificate of insurance last took it at the hazard of its being inoperative by reason of the certificates previously granted, and the amount of property put at risk under them.
That he, as well as the Company, must recognize the rights of the holder of the certificate of insurance first granted—a certificate constituting a valid contract between the parties to it when made, and not to be avoided (if avoided at all) on the sole ground of a subsequent contract with himself in the same form, and of his individual acts under it.
I cannot understand on what principle a contract between A and B, valid in all respects, and under which both are at the time acting, and by which A, in such an event as has happened, is entitled to recover a certain sum of B, can be defeated or impaired by force of a subsequent contract between B and 0, and anything 0 may do under it.
The plaintiff’s contract is first in point of time, and he has precedence, therefore, in point of right.
If the aggregate limit of $750,000 had not been reached at the time the property insured by the plaintiff was lost, I do not understand it to be intimated in the opinion delivered at Special Term that the plaintiff would not be entitled to recover. If he would *557 be, it would not be for the reason that any contract was made at the time the cotton in question was shipped; but his right to recover would rest on the grounds that the contract of the 15th of November, 1853, (treating the time of the renewal as its true date,) was a legal and valid contract of insurance, and that there had been a loss from the perils which it insured against. If there was not a valid contract of insurance from and after the time the certificate was delivered and renewed, then it follows that the plaintiff never had any property insured by force of his transactions with J. Day & Co.; for he never made any contract except such as the certificate granted and the Policy to which it refers express and create.
To hold that the certificate first granted is a valid contract of insurance, and is to be deemed continuous until terminated by notice from the Company, or by agreement of the parties, and to also hold that, while both parties are acting under it as a valid and subsisting contract, it must be treated as inoperative from the moment that J. Day & Co. ascertain that, under certificates subsequently granted in like form to others, over $750,000 worth of property has been put at risk in such sense that property subsequently shipped will not be protected by it, would, as I think, disappoint the expectations and intentions which all parties to the contract must have had and acted upon at the time it was made.
Whether, on the occurrence of the fact that more than $750,000 worth of property was at risk, the powers of J. Day & Co. had been exceeded in such wise that those who shipped under the certificates last granted could not recover in case of loss, is a question which it is unnecessary to decide now.
But, if any person thus insured is to be treated as uninsured on the mere ground that an aggregate limit was prescribed beyond which the defendants could not be bound by the acts of J. Day & Co., such persons are to be ascertained by taking the dates of the contracts to insure, in the inverse order of the times when they were severally made.
Jewett, J., in Truscott v. King, (2 Seld., 157,) states that “the principle is well settled that a mortgage or judgment maybe taken and held as security for future advances and responsibilities to the extent of it, when that forms a part of the original agreement between the parties; and the future advances will be covered *558 by the mortgage or judgment in preference'to the claim under a former intervening incumbrance, with notice of the agreement.”
The report of that case does not disclose that any member of the Court dissented from that part of his opinion. If that be the rule, then it may be said in this case by the plaintiff, to every one whom the defendants, subsequently insured through the agency of J. Day & Co., that you had notice by the -indorsements made on the Policy, when you obtained insurance under it, that, by a valid contract, made on the 15th of November, 1858, I was insured from that date until the 1st of July, 1854, for all cotton that might be shipped, as described and provided in and by the indorsement then made on the Policy, between those periods. It was your folly, or at your own risk, that you relied upon a Policy that might become inoperative by reason of the aggregate risks under it and previous contracts of insurance exceeding $750,000 in all, while your own property was exposed to peril.
It is very obvious that this mode of making contracts of insurance is ill adapted to protect parties at Apalachicola desiring insurance on property situated like that in question, and who must be insured, if at all, by open Policies by which property shipped after the granting them would be covered; especially as, in many instances, it could not be known that the Policy had attached to specific property until the voyage insured against had been performed.
If, in such a case, all property shipped after over $750,000 in' value was at risk would be uninsured, (although it was unknown to any one when the last shipments were made that such aggregate had been reached,) them it-follows that those holding certificates would have no means of ascertaining, after the business had been prosecuted in this mode for a brief period: of time, either by application to J. Day & Co. or otherwise, whether expected consignments, covered by the terms of the contracts made, would be protected or not.
And in case of shipments made at different ports on the day when the aggregate limit was thereby reached and exceeded, the rights of parties would depend on the hour or fraction of the hour at which such last shipments were made. And so, too, if this view be correct, J. Day & Co., by taking a definite risk which would fill up the supposed limit of $750,000, on the morning the *559 cotton in. question was shipped and before it was shipped, would thereby cancel and annul the contract between the plaintiff and defendants, which contract, but for such act, would remain in full force, and protect the cotton in question.
It seems to us that the contract first made gives priority of right, if all the assured are not to be protected; and, as the adoption of that rule makes a new trial necessary, it would be out of place to attempt to settle, in this case, what rule must obtain between the defendants and those with whom they made contracts at a later date. If any case arises in which it shall be established that, by allowing the claims for losses of those who insured at a later period, the defendants will bo held to have been liable for risks in the aggregate to an amount exceeding $750,000, that will furnish the appropriate occasion to decide the question of the defendants’ liability in such a contingency.
We think the judgment should be reversed, and a new trial granted, with costs to abide the event.
Ordered accordingly.